May it please the Court, the initial issue in this case is what type of search occurred when customs agents forensically searched Mr. Kolsuz's iPhone following his arrest in answer that question with a simple rule. Customs agents may conduct order searches only when they are examining a person or item to determine whether that person or item may lawfully enter or exit the country and along with that whether a duty is owed. That rule has a number of benefits. First, it's easy. What is your rule again? Customs agents may conduct order searches only when they are examining a person or item to determine whether that person or item may lawfully enter or exit the country or whether a duty is owed. That rule is easy for agents to follow and therefore it comports with the Supreme Court's preference for bright line tests in the Fourth Amendment context. It is also faithful to the Supreme Court's precedent and this Court's precedent. I'm sorry, I didn't hear you. What is what showing do you think the government has to make in order to undertake, what are you saying, what showing does the argument I am making is as to which type of search it is. So the showing, whether this is a border search at all. Correct. In order for it to be a border search, my, the rule I am urging is that there has to be the facts that implicate the government interests underlying a border search. So in other words, an anticipated border cross. Why would this not be a border search? Because at the time the search began, which is when the government interests have to be judged, there was no anticipated border crossing by that phone. It had been, the owner had been arrested. The phone had been seized in relation to that arrest and prosecution. The phone was not. Are you saying that an arrest makes it cease to be a border search? In this case, where there is no entry of the phone to cross a border, there are other situations. Well, I thought you were arguing for a clear rule and is your clear rule that an arrest makes this no longer a border search? In the case of an exit search, yes, where there is an exit search and the phone is no longer going to cross a border. But our case law is pretty clear that entry and exit searches are no different. They are no different. From the standpoint of border search documents. From the standpoint of the government interests that are involved, that is true. That is what the court said in Oriaki. And I'm not disputing that the same government interests apply in both entry and exit searches. But those government interests are not at stake once the item is no longer crossing a border. So, which is different in an entry versus exit context. In the entry context, like in Ickes, the person was arrested. The computer still had to clear customs. It was coming into the United States. Either it was going to be seized or if it had no contraband on it, it was going to be placed with mystery. How would the arrest make a difference if the search is at the border for items that are going to traverse the border? If the items were still going to traverse the border at the time the search commenced, then I would agree with your point. But here, where the items were known by the agent not to be crossing the border, not to have any intended border crossing at all, then traditional Fourth Amendment principles apply. The government interests that permit warrantless, suspicionless border searches simply weren't at play. What you're dealing with here is this activity took place at Dulles Airport. You border are at the border as much as the Rio Grande. There's no dispute as to that. At heart, aren't we talking about items that are intended to cross the border? Either one going out or crossing the border, coming in. That's the whole thing. We are, Your Honor. But I would submit that in Gant, Riley, Florida v. Royer, all the Supreme Court's cases on warrant... I'm nervous about transferring those because Riley wasn't a border search case at all and neither was Gant. Gant was dealing with a search of a car going down a domestic highway. It could have been any kind of car. The sovereign interest in a Gant search and the sovereign interest in a Riley search are simply as different as night and day. Your Honor, I agree with that. I'm not citing those cases for anything they say particular to border searches. I'm citing them for what they say as to how warrant exceptions are understood and interpreted. And they must be tethered to the interests that permit the search. And Gant is very clear that it is determined by how those interests exist when the search commences. That's why in Gant, for example, the interest would have permitted the search perhaps three minutes earlier, but not when the search commenced because of the fact that they were when the search commenced. And I'm citing... I have a question about the tethering to the interest. Does it make any difference in this case that the phone was searched because they suspected this person of a crime that does implicate border security, you know, this export control violation? Would this be a different case if, you know, some local police officer suspected the defendant of robbing a 7-Eleven and called his friend at the airport and said, look, this guy's going on vacation, take a look at his phone. Is that a different case? I would submit that it's not because the type of crime, for example, this crime had a search for this type of crime occurred domestically. Somebody thought a person was part of a ring violating export regulations and a person wasn't traveling internationally, but the government simply wanted to search his house. The regular Fourth Amendment rules would apply. I don't think the subject matter of the search or the statute being investigated makes a difference. The Fourth Amendment applies if the search is not being border crossed. I'm just still very concerned about this whole idea that an arrest makes something cease to be a border search. Now, with an incoming search, if you fail to arrest someone, you leave the customs agents perhaps in greater danger and you leave the suspect or the person to be search-free to roam at will. So you put a big disincentive on any kind of arrest and you pay a price in terms of the agent's security and the public security at large. I'm not sure why it's any different to have one rule for an arrest pursuant to an incoming search and one rule with respect to an outgoing search because we have at least three cases that say border searches are incoming and outgoing. And if you fail to arrest someone, that leaves them simply much freer to be on their way either to inflict harm or to be impossible later to apprehend. So the idea that an arrest changes the nature or characterization of this search, I just don't see that holding up. But I don't think that's your argument, is it? It is not, Your Honor. Okay. The argument is that in certain situations where an item is seized such that it will not be crossing a border, in that case... But what if the person carried the item? If the person is not going to cross the border, then the person can't be border searched. If either item is not going to be crossing a border and the agent doesn't have a reasonable belief that it is, the agent can't search it with a border search. No, it can search it with any of the other traditional Fourth Amendment rules. Or it can get a warrant. Can you go back to your tethering? I'm not sure I understand what it is. What I gathered your position was is you want us to use the analysis that the Supreme Court used in Riley. But you acknowledge that Riley is not the same kind of search we have here. Okay. So using that analysis, what do we do? Well, there's two questions. If the court is first using it to determine which type of search occurred, then the tethering, I think, is important because the interest at stake at the moment the search begins determine whether a particular exception applies. So here at the moment the search began, there was no imminent or anticipated border crossing. And therefore, government interests relating to the border were not in play and the border search exception wouldn't apply. In addition to that, if then traditional, but if the court were to apply the border search exception, I'd submit that Riley applies to whether a warrant would be required for the search that would then occur if the court were to interpret it and I get that. But can you spell out that second point a little bit? Certainly. So the cases that where a diminished expectation of privacy was... Let's assume it's a border search. Right. Assuming it's a border search. And what do I do under Riley? Understood. Under Riley, Riley requires the court to re-examine the interests that permit searches in the case of any warrant exception when the case law was premised in the pre-digital era. So there's pre-digital cases about a diminished expectation of privacy upon approaching the border. Those cases are premised on two facts that simply don't exist anymore. One being that people typically don't have a lot of private information when they travel. It's just the contents of their pockets and their suitcase. And secondly, that it would be easy to simply choose not to travel with if a person has things that are private, it's very easy to just leave them at home. We're going to be litigating the government's interest all day long under your formulation. We're going to say, well, when does the interest shift and when does it not? One of the things that I'm concerned about here under what you're telling us is that I'm having a hard time understanding exactly how it would be applied in an actual border search situation and whether there's any kind of guidance that's being given. Because what you're saying is general and somewhat fuzzy to me because you say, well, when does the government's sovereign interest shift and when does an arrest break a border search and when does it not? So your comments are suggesting about five or six different sub-issues to me, which is troubling both from the standpoint of guidance but also from a standpoint of the traditional interest protected by a border search, which didn't carve it up into little bits and pieces. Understood. To make it simple, my point would be first, it's not a border search when there's not an anticipated border crossing. Secondly, if the court does nonetheless evaluate it as a border search, the answer is simple. If the agents want to search a cell phone in the context of a border search, they need a warrant in light of Riley because the underlying rationales for exempting border searches because of diminished expectation of privacy no longer exist in the current world. Riley explicitly requires this court to reevaluate those sorts of holdings. We have our own precedent indicating that a warrant and probable cause are not required for border searches. I don't see how those cases would say that a warrant and probable cause are not required. I'm not sure how those cases can be abrogated by a Supreme Court decision that is not. In fact, a border search and Riley was not and Gantt was not, and they don't override the border search cases, including the Supreme Court's own border search cases. It's not just a matter of our precedent. It's a matter of theirs too. Understood, Your Honor, but Riley explicitly says that law on warrant exceptions that existed in the pre-digital era has to be reevaluated when those exceptions are applied to digital devices like smartphones. So Riley explicitly requires this court to revisit that analysis. Let me just ask you, the thing that I find difficult about this argument, I understand what you're saying about Riley, but there's that Supreme Court case where the woman gets chained to a bed for 16 hours so that her bowel movements can be monitored. And the Supreme Court said, that's fine on reasonable suspicion. You don't need a warrant. Even in light of Riley, I mean, it's hard. It's a little bit apples and oranges, but even in light of Riley, can we really say that having someone look at your cell phone is more intrusive than what happened to that woman, which the Supreme Court said you can do on reasonable suspicion? Certainly, my light is on, but you can answer the question. Thank you. So two answers to that question. First, Montoya de Fernandez, which is where I think the case the court is referring to where there was a court order allowing some of what the agents did, and also a less intrusive means was offered to that woman, which was an x-ray. She turned that down and chose the more intrusive thing, and that was an underlying fact in that case. But in addition to that, Riley held that the privacy interests at stake in a cell phone, and this is a quote, are far more intrusive, or the search of a cell phone is far more intrusive than the search of one's home, which is typically considered the zenith of privacy interests, and general searches of a home have always been considered something that require a warrant other than in one of the delineated exceptions. So here, those privacy interests recognized in Riley are extraordinary and greater than what was an interest in that case where the person's dignity interest was certainly implicated. The only facts that were going to be divulged was whether she was a drug courier or not. There was not a lot of intrusion into her private information other than that. Well, actually, that is not true, too, because remember, they did her a pregnancy test because she said she was pregnant. So I just think you have a, I have a very hard time with that case, too. It's hard for me. I know my friend Judge Wilkinson doesn't think I live in the real world sometimes, witnessed the earlier case, but in the real world, that case seems like a more, a greater intrusion on privacy than looking at every single thing in your cell phone. So anything more you can lend with that argument, I'd appreciate. Well, there was a court order in that case for the pregnancy test. So a court order, I think, is the equivalent of a warrant. But it wasn't until sort of halfway through, as I remember the facts, or even more than that. Correct. I think that they held her, they gave her the option of an x-ray, which she turned down, claimed to be pregnant, if I'm getting the facts correct. But I believe that that's how it unfolded. And I think the fact that she was offered a less intrusive means was relevant to the court's analysis that she chose this. One thing that concerns me here is that I think that there is a particular danger in transnational crime. And one need only recognize the international nature of many conspiracies and the dangers that exporting classified information and bringing either physical arms or classified information in some way, putting them in the hands of foreign governments, give them a comparative advantage in either actual warfare or cyber warfare against this country. And so it seems to me that these technological devices and the capacities that cell phones have made possible are used widely by those committing conspiracies. And most of these prosecutions, or a great many of them, are not solo activities. People are not crossing the border solo. They're crossing the border with other people in mind and with particular deliveries to other people in mind. And they have an aspect of conspiracy to them. And what troubles me is that people are using these devices to commit more and more sophisticated conspiracies and to have more and more easier and easier ways to coordinate the conspiracy and to get in touch with one another. And yet, at the same time, when we're witnessing these not only outbreaks of violence in individual venues, but the fact that the world is rearming itself in all kinds of places and in all kinds of dangerous ways, we, at this time, are going to throw up obstacles to border searches and give people more advanced means of committing what are very dangerous acts and crimes. At the same time, we're going to give the government fewer and fewer ways under traditional doctrine of combating them. And at a certain point, you just lead the country into a very serious state of imbalance. I mean, it seems to me, in some ways, yeah, I understand the interest in privacy that a cell phone represents. I give you that. But there's still a balance to be struck here. And I just worry about imposing too many requirements of individualized suspicion because it's very – the one thing about a border search, and we find it when we go and board an airplane, we are subject to intrusions that are not welcome. We have to take off our shoes and empty our pockets and God knows what else. But the reason those steps are required is that individualized suspicion, which is the traditional staple of Fourth Amendment law, but which border searches say you don't need. But individualized suspicion is often very hard to come by. These no-fly lists and others are very imperfect, which is why we're having all these screenings and everything. And, yeah, it's – I don't know. I think that a world of perfect security and perfect privacy is not going to be ours. And we're going to have to make some sacrifices that in an ideal world we wouldn't wish to make. But it's even a little bit self-indulgent to say that at a border we're going to insist upon inviolate privacy. There's a real cost to that, which there wasn't in Raleigh. And I totally agree with Raleigh and Grant. It's just the transposition of context that's attempted this morning that I find troubling. Understood. May I respond? Your Honor, all the interests that Your Honor is raising relating to transnational crime, those interests exist in the context of any search in the subject matter, whether at the border or elsewhere within the country. The Fourth Amendment and its exceptions and the warrant requirement are more than capable of responding to all those interests as they do in any non-border search. The only question in this case is whether those interests existed at the time of the search in a way particular to the board.  Unless the Court has further questions, my time has run out. Your Honor, we have no further questions. Thank you. Ms. Bhandari, we're pleased to hear your view, please. Thank you. May it please the Court, Aisha Bhandari for the AMICI, American Civil Liberties Union, et al. Should this Court consider the search that took place to be a border search? We nonetheless urge the Court to hold that searches of the content, the digital content of electronic devices at the border, must be done pursuant to a warrant or at a minimum probable cause. But on our cases, that would contradict you. Your Honor, we think that Riley is instructive, not that it— Well, but what I'm saying is we have case law, ICCE, which says a warrant is not required and probable cause is not required. And there are other cases, too. That's just one of them. Now, how can a non-border search overturn explicit precedent on that point? Your Honor, respectfully, we think that ICCE is distinguishable. ICCE was decided in 2005, and it was a search of a laptop. In 2014, in Riley, the Supreme Court noted explicitly that the smartphone that was searched on the defendant was not even contemplated 10 years previously. And the Supreme Court's decision in Riley proceeded to consider the privacy interest in light of the ubiquity and the comprehensive nature of the information contained on smartphones that were available in 2014 but, again, had not been contemplated 10 years previously. ICCE also considered a First Amendment challenge, which was looking at whether expressive materials could be exempted from the border search doctrine, which allowed for the search of goods. And this Court held that that rule could not be sustained, that, in fact, the border search, which permitted searches of goods, could not exempt, quote, expressive materials. But it did not squarely consider whether the Fourth Amendment argument that the digital contents of devices are not categorically within the border search exception, whether that argument could stand water. Are you relying, in distinguishing ICCE, are you relying on this distinction that other courts have drawn between sort of just opening up a computer or phone on-site at an airport, seeing what's readily available, versus this kind of deep digital dive that you do later off-site? Certainly, that is one distinction, that ICCE's only involved a manual search. We think that even the search on-site requires a warrant or a minimal probable cause. The search on-site challenge in this case, are we only looking at the subsequent, I don't know, I keep calling it a deep digital dive, but you know what I mean, this is technical. This case only involves a challenge to the later search, which produced the 896-page report of the contents of the device. So I think that the case law in ICCE is distinguishable. I also think that in Ramsey and in Flores-Montano, the Supreme Court explicitly held open the possibility that there are some searches at the border which may be per se unreasonable because of the offensive manner in which they are carried out. So the Supreme Court certainly contemplated the possibility of limits on the border search doctrine, and I think that Riley really is instructive in this respect, because Riley said that any extension of an existing Fourth Amendment warrant exception to digital data must rest on its own bottom, and Riley explicitly distinguished Robinson, the previous case which had held that a search incident to arrest of a cigarette packet was permissible without a warrant, even though the particular justifications at issue were not present there, namely harm to the arresting officer or the possibility of finding evidence. Nonetheless, the Supreme Court distinguished that because it said that digital data is so different from the search of physical objects that the categorical rule that applies to it must be evaluated in its own light. And it then proceeded to balance the private interest. No, the untold thousands of people cross the border all the time and say that, you know, we're going to have individualized probable cause or a warrant. I do think that's unrealistic. I just don't see how, given the volume here, it's reasonable to expect the government to it's going to be virtually an impossible standard, given the volume. And so I do worry about simply the realistic nature of it. And it's, as I've said this before, but it's the very difficulty of developing an individualized suspicion that leads to these inconvenient lines every time we even get on an airplane for a domestic flight. We don't, you know, you don't know. They don't, you can't trust an individualized suspicion. And that's why you have to have authority to conduct a more general procedure, because it's just very hard to develop individualized suspicion, given the number of people that are coming, pouring in and out. I see that my time is up, but if I may briefly respond to Your Honor's question. I think that the border search exception has always been tethered to the need to keep out contraband goods. And the discussion of the difficulties of individualized suspicion in that context have all focused on that. But a rule requiring at a minimum probable cause for searching digital data is no different than the requirement for law enforcement in a domestic context, when they're investigating crime. The probable cause, the evidence of the crime is present in the device to be searched. Any rule different than that would allow the government to essentially treat the border as a dragnet to copy the entire contents of individual devices without suspicion, and to search those and retain those. And so we think that the rule we're urging would, in fact, bring the rule at the border for digital content in line with the rules that already govern domestically. Can I ask you a question before you sit down, Chief? Oh, sure. So I'm not sure from your presentation whether you think that Riley tells us that because we are dealing with this large quantity of digital information, whether we should use a probable cause or a search warrant. I think that... Whether we need reasonable articles of suspicion or a search warrant. I think that Riley tells us that a search warrant is necessary, and all of the factors... That's not what you're espousing in either or rules, I thought. Well, we certainly think that the Fourth Amendment requires a warrant, but if this court disagrees, we think that at a minimum, probable cause as an alternative, given the grave privacy interests at stake. And I think Riley would compel a warrant requirement, but we are arguing that in the alternative, at least probable cause would... You know, I've heard this whole discussion has concerned your comments and that of your colleagues, have concerned the privacy interests at stake in this case. And I grant you there are privacy interests at stake in this case. I know there's a trove of information on cell phones. I'm not happy about the invasion of anybody's privacy anytime, anywhere, but there's this big lacuna in your case, and maybe you don't feel like you need to address it because it doesn't help you, but there's just an unwillingness to admit the problems that come with the rule and how they can be addressed, or the fact that there exists very serious national security interests at play here and the kind of things in an outgoing search, which the Supreme Court has said is no different from the incoming. People can be taking things of two kinds. Number one, valuable classified information, and number two, physical arms on the munitions list. And whether it is one or the other, it seriously damages this country, and it makes the world a more dangerous place in which to live. And, you know, we just can't have it all. I wish we could. Hard as it may be to believe, I love my privacy as much as anybody, but I just don't think I can expect perfect privacy, given the dangers in the world around us and the trend in which crimes of mass casualties, all the way from just opening fire in a cafe to exploding nuclear and hydrogen bombs, that the trend is that the danger of these things is increasing, along with the increasing availability of technology and the increasing availability of the means to commit these. And I haven't heard you express the urgency of those kind of interests, and the fact that a lot of it, those interests, a lot of these dangers are fomented and exacerbated by cross-border traffic. If I may, Judge Wilkinson, we certainly acknowledge the government interests here. And I think that Riley examined the government interests in that case as well. And certainly, when we're talking about digital data, the argument that we're making is that the government interest in preventing the entry of unwanted people and goods, which is the justification that has always underlied the exception to the warrant requirement at the border, that those interests can be effectuated even by requiring individualized suspicion for searching the digital data. And that the government's interest in preventing the entry and export of those goods do not necessitate dispensing with an across-the-board... How do you suggest, as a practical matter, they're going to come up with individualized suspicion? They had it here, didn't they? Yes, they did, Judge Harris. However, they did it here. Can I ask you a question? You're not challenging the part of this search where they opened the guy's bags and found the guns at the border, correct? That is correct, right. That would be clearly when it comes to being able to search for actual weapons crossing the border. Nobody is saying you can't open a bag to see if there's a weapon inside. That is correct. And you're not challenging the seizure, are you? No, I'm not. It's not challenged in this case? That is my understanding, yes, Judge Monson. So they can hold this computer, cell phone, for whatever reason? That, exactly. The challenge here is to the forensic search that happened and produced the 896-page report. Do we have time for one more question? Just assuming, and please, this is just by way of assumption. If one were to think that the district court got this basically right, the forensic search here is a border search, but it's non-routine. It does require individualized suspicion. There was individualized suspicion here. Is it necessary for us to reach the... If that's what one thought, would it be necessary to reach the constitutional question? Is there a reason to reach the question in this case? It would not be... It may not be strictly necessary, Your Honor, but we do think that guidance to lower courts is imperative, given the fact that there are millions of travelers who cross the border. Most of them will never be charged with a crime. The context of raising a privacy claim just doesn't arise for the vast majority of travelers. We think guidance is particularly critical in that context. You might like us to reach these questions, but in this particular case, we have somebody who has been twice arrested and found to have been exporting arms to Turkey, I suppose, through JFK. And those arms were clearly prescribed under the munitions list. So given that kind of background, there's individualized suspicion in this particular case. So, I mean, why would we... I can't speak to that, Your Honor. Why don't we just decide the case, this case, and say, assuming that there's a reason, without deciding that reasonable suspicion is required, it's here in abundance. This court could certainly take that approach. And if it does, we would simply urge that its decision not sweep so broadly as to privacy interest. Our concern is that there are, as I said, millions of people who cross the borders every day with digital devices providing access to massive amounts of intimate information. Don't worry. There's so much litigation over this that an answer will soon be forthcoming, even if it's not this very day. It will be forthcoming. There's so much litigation. Thank you very much. I would like it to come before I take my next vacation. Thank you. We thank you. Mr. Smith. Thank you, Your Honor. May it please the court. Jeffrey Smith for the United States. Your Honor, no court has ever required a warrant for a border search of any kind of any person or any item. And the reason for that is that to do so would create a sanctuary, what this court in Ickes called a sanctuary at the border, even for terrorist plans. The border search principle rests on, sorry, the border search doctrine rests on fundamental principles of national sovereignty, which, as you've noted, apply equally to exit and entry searches. Excuse me. The defendant suggests that Riley somehow abrogates the border search doctrine, and this is incorrect. Isn't that kind of weird, counsel? Just explain to me as a matter of common sense. If under your position, if I want to go on vacation, the government can look at everything about my life, take my phone, take it off site, generate a hundred page report about everything about me. But arrestees get more of an expectation of privacy in their digital data than I do when I go on vacation. How is that right? Well, the search and incident to arrest exception is based on narrow government interest, specifically the interest against the interest of officer safety. So the officer can look for a weapon that might be used against him in the interest of destroying evidence. But the border search rests on much broader national security interests, interests in protecting our sovereignty, in stopping transborder crime, in protecting against terrorism, export violations, counterintelligence, sex tourism, that type of issue. And the strong government interests have long been found to outweigh the privacy interests, which are significant. Council suggests that people assumed that people never are, that it was once assumed that people didn't take things with them when they travel. But that's not ever been the assumption. People move across borders. I think it was more that I thought what Council was saying was that there was an assumption before that it was sort of optional. You could take or not take highly private items with you when you went on vacation. Whereas today, as the Supreme Court did acknowledge, you know, pretty much you have to carry your phone, particularly when you're traveling. That's the time when you can't do it at your phone. Well, I'd make a couple points of that. First, I don't think even with physical items and very sensitive ones, it's not necessarily optional. People move across borders. They need to send all their stuff. That was, that appeared to be the case in Oryaki. And Ickes, the defendant appeared to have all of his property crossing the border. People go on vacation, they need to take their medications and other things that might be very, very sensitive and reveal personal things. People take other things on vacation that might reveal very private things about themselves, like sexual orientation. You're suggesting that you don't need to take a cell phone because of your, or iPhone because of the danger of when you travel, you could lose that, you could lose that data, I suppose, by being robbed or by just losing it. And then you'd be, you know, in a pickle. So what are you suggesting that as a result of, I mean, it used to be when we traveled, we'd pack our suitcases and, you know, when, not that I have fancy clothes, but I didn't put them in because I didn't want something, anything I cared about, I didn't take with me abroad because I didn't want something to happen to it. I'm not sure I can give too much travel advice, but the, excuse me, the fact is people have a choice as to which electronic devices to take, whether to take an electronic device, and also what information to have on that device. You can move files to the cloud, which can't be searched during a border search. You can delete apps and easily reapply them. There are all sorts of tips for this actually on the ACLU's own website, where they acknowledge that this is going to happen. And here are some tips you can do to take anything that's particularly sensitive to you that you don't need on your vacation. In this particular case, the defendant was coming to the United States for a week. I don't know that it was essential that he bring his cell phone, except that during that week, he was making what the simple point that you don't have to take a trove of data with you when you go, when you cross the border. No, you don't have to. I think it's very different from the search and send to arrest in the sense that you don't, well, one does not normally know when he's going to be arrested. And so he's not in a position to set his phone, to take only the phone that he wants to be searched or to take the sensitive data and move it to the cloud, where when you go across the border, you choose what you're submitting to a border search. And, you know, as Judge Harris suggests, it's not without cost to decide not to take something. Well, so where is this? I think that's an interesting idea. Where's this idea about if you're on notice that you'll be searched, there's sort of a lesser constitutional standard for? Well, so I think that that has always been part of the analysis underlying the border search. I think the principal issue is the government. So it's the only area where you have this on your on-notice principle. I mean, you can't give me another exception to the Fourth Amendment that you also rely on the on-notice principle, or can you? Actually, if I could, I think that it is a specific, one of the specific factors underlying the border exception is that the traveler decides what to take with him. In terms of other exceptions, I think in special needs area, it may not be the case in all special needs cases, but I think that that's a significant factor. For example, Judge Wilkinson was talking about searches that on a domestic flight where there are searches. These aren't border searches, but they're to make sure that someone doesn't have weapons or explosives. That's a special needs search. And I think part of the analysis for that is for the reasonableness of that would be the extent that people choose to go through a point where they know that they're going to be searched and they choose what to take on that. Do you think they should do digital searches on domestic flights because people are on notice? They were on notice if the government says tomorrow, you know what, to be really safe, we're going to need to look at your flight. What about on buses? I see. I thought the rule was just the opposite. You get on a bus and you don't lose your Fourth Amendment rights. I don't think anyone loses their Fourth Amendment rights at any point. The question is what the Fourth Amendment requires. Now, the question was, could the government search electronic equipment? I think you have to do a special needs analysis. I don't think in the special needs analysis for flights that you would be able to do that because for flights, you're looking specifically for explosives or weapons. For the border, it's a much broader interest. The government and in this court in Ickes talked about terrorist plans, terrorist communications. It's not simply contraband, but even contraband can be found on phones or computers, things like child pornography. That was the issue in both Ickes and Cotterman. Things like malicious software, stolen secrets. And so, you know... May I ask you, just while you're talking about the government interest, the same question I asked your colleague. In this case, there was suspicion of a crime that does seem to implicate border security. And you refer to this several times in your brief. Like, what was that issue here was this crime, the export, arms export violation that goes directly to kind of guarding the border. Is this case different if, sort of in my hypothetical, someone is... The police have a hunch that someone has committed an entirely domestic crime, robbing a 7-Eleven. They call their friend at Dulles and say, take a look at the phone. I don't think it comes out differently. But I, you know, I understand where you're coming from. And I think that's a different case that this court could easily reserve. Well, if reasonable suspicion is required, let's just, again, I'm asking you to make the same kinds of assumptions I asked your colleague. If just assume for a minute that reasonable suspicion were required, would it have to be reasonable suspicion? Would it be sufficient for the government, do you think, to come in and say, we have robbed a 7-Eleven last week? Or would it have to be reasonable suspicion of some kind of a crime that is tied to the border, given that you'd be coming in under the border exception? Well, we don't concede the reasonable suspicion, Senator. But I will ask you a question. To the extent that reasonable suspicion does apply in border searches, and it sometimes does, I would look first to the succinct statement in Abuchi, a Ninth Circuit case, which says it's reasonable suspicion that the search may uncover contraband or evidence of criminal activity. So I think that any type of criminal activity could justify reasonable suspicion to search. And if I could cite a couple other cases, also from outside the circuit, but very persuasive cases, United States v. Levy from the Second Circuit, where the court assumed without deciding that reasonable suspicion applied to the particular search, the court found that it was sufficient that the agents reasonably suspected that the travelers engaged in criminal activity. And the criminal activity in that case was securities fraud. In United States v. Gurds, a D.C. Circuit case, the criminal activity was financial fraud. And the government agents arrested the defendant when he arrived at the airport. And the CBP, with assistance and advice from the FBI, searched his luggage for evidence of that financial fraud.  Well, I think it's reasonable suspicion of evidence of a crime or of contraband. So it wouldn't be the mere fact that the defendant is a criminal doesn't give you carte blanche to search anything, necessarily. Yes, I agree with that. It would be reasonable suspicion of a crime. And I think it could be a past crime, like in Gurd, an ongoing crime. There doesn't have to be any nexus to the border. No. No, Your Honor. I don't think there has to be any nexus to the border. I think that's what the case law shows. Let me ask a question that follows up, I think, on what my colleagues have explored. We spent a lot of time discussing all kinds of interesting and difficult problems. But at the end of the day, our job is to decide the case before us. And here, given the fact that he was found to have exported the arms on a munitions prohibition list to Turkey, and the government used that, and the government when he was going to Cleveland and then to Dulles, to notify the authorities in Dulles of this past criminal history. Assuming that reasonable suspicion is required, wasn't it available in abundance here? And if reasonable suspicion exists in abundance, does it really need? Is it necessary for us to get into all these other cases? I mean, sometimes it just is good to say sufficient unto the day. Yes, Your Honor. We'll do this, and then we'll wait for another case, and we'll decide that. And the law will develop in the way that the common law always developed, which was incrementally based upon facts rather than ex-ante, based upon a broader legal proposition that is not really presented by the facts. No, I fully agree with that, Your Honor. First, I agree that reasonable suspicion here was present. The district court found that the government easily surpassed the reasonable suspicion. So why did it end with an arrest? You don't make the contention that it's just being made in your brief, do you? In other words, don't reach the constitutional question. Just there's reasonable suspicion here. Just assume that if that is necessary. So I guess we're asking you why you never made the argument. Well, I think we did say in our brief that the court did not need to reach the question of whether reasonable suspicion was required because it's clearly present here. But on the other hand, it's a little bit weird because it wouldn't allow us to avoid constitutional rulings. We would still have to rule as a matter of constitutional law. This is a border search. Probable cause isn't required. A warrant is required. You want to stop making constitutional rulings right at the point where the district court at least thought the petitioner won, the defendant won. That's when we should get out of the business of making constitutional rulings. We have to decide a bunch of constitutional questions against the defendant and then not reach the one question where the district court agreed with the defendant. Well, I think the issue for constitutional avoidance comes down to whether it's a novel and difficult constitutional question. I think the question, first, the question is whether this is a border search is unavoidable. And I think it clearly is. And I'd like to get back there in a second. But the second question of whether a warrant is required for a border search, I would argue, is not a novel and difficult question. It's a question that's been clearly answered by this court's precedents. Whether Riley has bearing on that and requires... Possible that precedents could be distinguished, particularly given that the first on-site manual search isn't being challenged. But one way or another, I think that it is hard to say that the how to deal with Riley in this context does not raise questions at least. At least it's hard to me. Okay. I think that I would distinguish between two different aspects to that. The first question of whether a warrant is required for a border search, I think, is not a difficult question. It's not something that Riley touches on because it's not talking about border searches at all. And as I say, no court has required a warrant for a border search of any kind. Other courts have addressed... I mean, the search in the Cotterman case was significantly more intrusive than this case. The court didn't require a warrant there. So no court has required a warrant. So I think that the court does necessarily have to reach that issue. But I think it's an easy issue. Yeah. I mean, the question of whether it's a border search, whether the ingress and egress are incoming and outgoing, are treated under the same standards, the question of whether there's a warrant requirement, whether there's a probable cause requirement. On those four questions, it seems to me that the law is clearer and the precedent is more it is on the question of whether it's just a totally discretionary judgment on the part of the customs agent or whether some kind of objective justification is required above a totally discretionary judgment. Which brings us to the four straightforward questions. And then there's one more difficult question. And that is the question of reasonable suspicion. And I think you can see it as you must that when you are doing strip searches and body cavity searches, the reasonable suspicion is required. Now, I understand from your brief that that was it. But there's an argument about, and with two interesting sides to it, about whether reasonable suspicion should be required. On the one hand, you have the privacy interest. On the other hand, you have the difficulty of finding individualized suspicion. But that seems to me that I don't know why we need to answer that, given the substantial amount of the evidence relating to this individual's past activity. I agree with you, Your Honor. And I would note our concern is that a decision in this case that goes beyond the issues of legality of this search could have unintended and unforeseen circumstances in other areas. In particular, there may be, particularly, for example, in the counterterrorism area, there may be times where the government has reasonable suspicion, but it's classified such that the government can't even give it to the border search agent. There could be other circumstances where the government has intelligence about a group of people, but it's not sufficiently particularized under the individual standard that's appropriate. And these people were dangerous. And these people are dangerous. Well, then why wouldn't the exigent circumstances? Well, I think that you have to... I mean, I just couldn't think of an example where exigent circumstances wouldn't be available. Well, I think the exigent circumstances provides a different... Well, I can give you another example in a second, but I think exigent circumstances provides a more difficult balancing test. Where you have a situation... I think easily if you're in a situation where you're saying there are 20 people, five of them are going to blow something up tomorrow, we can search all 20 of them. I think that would be exigent circumstances. But in many cases, when you're talking about counterterrorism and foreign intelligence, you're building a case over a long period of time, over connections of people throughout a terrorist organization. And whether you would want to set a precedent where that could be done under any circumstances pursuant to exigent circumstances, including the domestic ones, I don't know. But what we're talking about in the border search is that we're talking about hundreds of millions of people crossing the border every year. Many of them are people who don't live in our country, and we don't necessarily know that much about, and that some of them are people who we need to know more about, not only to know whether to allow them into our country, but to know whether they are among the small group of people that would do us real harm, whether through terrorism or through spying or how it would be. So I did say I'd give you another example. I think another example would be, there are a couple of cases, and I'm sure there are many more instances, where the government has done a search looking for sex tourism and the trigger for the search, and by that I mean people who go abroad in order to basically use the greater wealth that Americans often have to exploit children in poor countries, and they often videotape this type of stuff. And sometimes the only basis for the search is the fact that the person has been convicted of a crime before, making it more likely that they, a child sex-related crime, making it more likely that they're someone like that. Now I think in the domestic context, you wouldn't allow- Okay, so your position is that you don't have any reasonable suspicion of those people, and you don't get a warrant, but you can still search them at the border. Right. I think because of the important government interest in preventing contraband, like child pornography, and the particular interest in which sex tourism harms our country- But you're conceding that, and I'm just surprised. Your view is that if a known sex offender is going to Thailand, there's no reasonable suspicion, but the government ought to be- you agree both that there is no reasonable suspicion, and that that person ought to be able to be searched anyway. So I want to leave open- This is actually my concern, that what we're talking about is a situation where you probably won't search my phone, I mean, knock wood, but that the government will use this unbridled discretion to explore hunches that it's not supposed to be able to explore until it can get to reasonable suspicion. Well, my concern is that there's going to be a lot of pretextual border searches, like the one you just described is a good reason not to put any constraints on what the government can do at the border. So, I mean, hunches are, in fact, a recognized basis for border searches. I'm not suggesting that that's a common basis, but as this court said in Ickes, the essence of the border search doctrine is the trained- is the instinct and experience of trained border agents. Now, with regard to the slippery slope problem, like the guy who robbed the 7-Eleven, and now you're going to search his phone, you can't get a warrant on him, you don't even have reasonable suspicion, but good news, he's in Dulles, so we can finally look at everything that's on his phone. You consider that, that's not like a bug, that's a feature for you. Well, and then the example you've just given us takes it one further. I mean, the man may not have, in fact, engaged in sex crimes abroad, but he may have a lot of nasty stuff on his cell phone. Not child porn, but a lot of really bad stuff that can be used against him. So, why should- just because he goes across the border and you have a hunch, are you able to get that information? Well, I'm not sure what you mean by used against him. If it's not criminal or evidence of a crime, the government wouldn't have a basis to retain it from the- Of course, in any search, you can come upon information that suggests a crime that you didn't necessarily go into the search for, but in the scope and within the scope of a search, you come upon direct evidence of criminal activity, you're not supposed to just turn a blind eye to it. No, that's- But you have to have a constitutional reason for the search. Well, that's right, Your Honor, and the border search is a recognized exception. But let me ask you this. What is the practical difficulty of developing individualized suspicion or probable cause or whatever with all these- with respect to all these many travelers? It's very significant. It's what? It's very significant, Your Honor. We're talking about hundreds of millions of people crossing our borders every year, and have limited resources. And they really, on average, have maybe seconds to deal with each traveler. Obviously, some people are going to get more attention than that. But the idea that- now, this case is a different case. It was an exit search based on investigative suspicion. And, you know- I mean, you had enough to get a warrant, right? This case- well, the district court found that after the search of the luggage that the government had probable cause. But as I say, no warrant is required in the border search context. So to the extent that a reasonable suspicion standard applies, we- You would say it's plainly present here. It's plainly present here, and the district court found that. But whether it's required, what you're suggesting to us is that if we require individualized suspicion for a border search that is not a body cavity or a strip search, that requiring individualized suspicion in each of these cases before a search can be undertaken is a significant burden. It's not just a theoretical burden. It's a very serious practical burden. Yes. Yes. And I think it would- Is that really true, though? Because according to the statistics that you gave us, I thought that the border people were pretty careful and specific about who they would subject this kind of search to. Well, yeah. Have I misread your papers? No, that's exactly what the court said. I'm sorry. No, you go ahead. Exactly what the court said in Ickes was, one can assume that these types of searches are going to occur in circumstances where there is some sort of individualized reason, but that it would be dangerous to constitutionalize that because the essence of the border search is the trained observations of- Right. I thought we were all talking about Judge Wilkinson's question about, isn't this going to impose an inordinate new burden on you? I thought I read your papers as you've already assumed this burden. You think that this is serious stuff, subjecting someone to this kind of search. Well, we do think it's serious and it's done in a very small percentage of cases, less than 1% of 1%. What you're suggesting, as I understand it, was, yeah, we do the best we can, but that doesn't begin to provide any kind of assurance. Yes. You do the best you can, but there's nothing that's even close to foolproof. And again, at the border, because it's so totally unlike a situation on a roadside or where you stop an individual car or something, because in the Gantt situation and the Riley situation, you don't have these long lines of people and this huge volume of people going through. It's very individualized there. Here, it's a mass. It's a mass of people coming at you at one moment, at one time. So it's so different. But the search that is at issue here was not subjecting a mass of people, mass of people where you've already picked this person out. And you would almost inevitably, you'd have to pick a person out before you do this full dump of everything on their computer. You've kept them for a month, indeed. Your Honor, it is the case that there are specific reasons for the very small percentage of passengers who have this type of search done. I do think you're talking about significantly extra resources if you have to both find and document a particular standard of individualized suspicion. And I note that even just here, maybe I was going to say we, but maybe it's just I have had difficulty getting into what is reasonable suspicion, what is not, what is actually in circumstances, what is not, where's the borderline there? And that's a lot to ask for agents who are not lawyers. And the Supreme Court has cautioned... If you get a lawyer, I mean, again, we're not talking about... My question is, I'm actually trying to get my hands around what you are saying the government wants to do with the unbridled authority you're asking for. I was not aware that part of the point was to be able to search specific people as to whom you had a hunch about tech tourism, but couldn't back it up with reasonable suspicion. And now I'm trying to figure out, is what you're saying, based on this conversation, that you would like the authority to be able to screen more broadly than you can now? It would be great if you could just get everyone's phone? Is that the only way to be 100% sure, right? And I thought that's the kind of concern that was being raised that you were addressing, that if you have to wait till you have a specific reason to suspect someone, you're going to miss too many people. Now, the government isn't seeking any additional authority or seeking to expand its current practice, if that's your question. The concern is... Like right now, the way you're doing it now, you're getting the people you need. It's just that you don't want to have to... You might guess wrong. You might think you have reasonable suspicions. This is a phone worth searching, and you might be wrong, and it would be bad to constitutionalize a misconjection like that. If I could go back to the prior conviction. I think there's a prudential reason why courts are hesitant to say a prior conviction for a crime gives you reasonable suspicion, because in a domestic context, that would mean a carry stop every day for the guy who was convicted. No, Mr. Smith, part of the answer has got to be that I think, as Harris suggested, when you constitutionalize it, you're bringing in a whole different dimension. You're bringing in a deterrent dimension. You're bringing in a litigation dimension. It consumes greater resources. There will be all sorts of people refraining or wondering or asking lawyers, do we have reasonable suspicion here? You carry it to a whole different plane when you constitutionalize this and put it on an individualized suspicion. It's speculative as to how many resources it consumes, but it sure will consume resources, both litigation resources, given the volume of people, and it will also direct the government. The question is also whether it would over deter. Now, given the national security dimensions of this, doesn't it make sense for courts not to charge out in front too boldly on this question? We're talking about resources and whether the government has the resources to devote to finding individualized suspicion and how many security agents you have and what ought to be the quantum of justification for doing this. Why wouldn't this, because it's an empirical matter of resources and because it's a preeminent matter of national security and safety, which the Fourth Amendment is charged to the judicial branch, but there are also matters of preeminent national safety and security and the border and the rest of those things, there is a large legislative hand in. Given the empirical dimensions of this problem and the fact that you and I and these able people opposing you can't answer all of these questions and shouldn't even try to in this courtroom, would suggest that Congress have an important role. This is something in which they have an interest, that they have a constitutional delegation, and that it seems to me tailor-made to some extent for a legislative hearing. And it just suggests to me, not that we abandon the field or give up the field, but that we don't just charge out in front by answering questions that aren't presented in the case and where we can develop the courts. The best way I can see it is not to abandon the field, but to at least allow it to develop incrementally based on facts and based on particular cases before us. Yes, Your Honor, I agree. I think that to the extent that the court is concerned about a different fact scenario, I would counsel waiting for a case along those lines that would have a record that either supports or doesn't support that particular search. I don't think you fully answered my colleague, Judge Harris' question. I apologize. Can you go back? Back to that? You don't remember? I'm not sure. If there's a question pending that I haven't answered, please tell me. The one that immediately preceded Judge Wilkinson's question. What I think she was asking you about is that your argument has opened up a whole area of searches that you want to undertake that we didn't really know were in the scope, that you don't have reasonable articulable suspicion, that you just have a hunch. And if you think that they're covered by the border search exception, that gives us a lot of pause here. Well, and particularly when you add in, like at least with the sex tourism, there's a bit of a border nexus, but you've been very clear that it would be sufficient if you just had a hunch that didn't rise to the level of reasonable suspicion that 10 years ago somebody got in a bar fight and the statute of limitations hasn't expired. That's their game too. Perfect. He's going on vacation. We've got it. I mean, you think that's fine, right? Well, Your Honor, I think that, I mean, these hypothetical scenarios obviously aren't presented in this case. But we have to have a rule that applies. That's our problem. I'm sorry. What we have to do is get a rule, though, that we can see would apply. And you've told us about these circumstances that just leaving things the way they are right now don't seem to be consistent with where the Fourth Amendment is being applied and being interpreted right now. Well, I think the question is, is the government looking to do the types of searches that you're talking about on a hunch or on a 10-year-old armed robbery charge? The answer is no. That's not generally where these searches are occurring. I think as a constitutional rule, though, as the court, again, said in Ickes, it's important that the court not impose a rule that may have unintended effects on other areas of cases, in important areas like counterterrorism. Can I ask you about another important area, one other hypothetical that occurred to me? What about immigration violations? Now, that does concern the border. So you'd have the nexus. So if you had a hunch that, say, somebody had a family member who was in the country without documentation, you could search the family member's phone as that family member went back and forth across the border, right, to see if maybe she had texts with relatives or friends who are in the country without documentation. There'd be evidence of that. I mean, that doesn't sound like something that would be done, although I don't know. It's not presented here. But it would be fine under your... Well, I mean, it would be... It would not violate the Fourth Amendment. Thank you, Judge Wilkinson. Thank you, Judge Mott, Judge Harris. Mr. Richman. Thank you, Your Honor. Just a few points in rebuttal. First, just briefly, the government makes a concession that it would not search things crossing... have been put on the cloud rather than on the phone itself. I consider that a concession because what the government's saying is we can't get to things that are on the cloud rather than on the phone itself because the things on the cloud are not about to cross a border. That is a concession as to what type of search occurred here because the phone wasn't about to cross the border. And the problem with that is if the court accepts the government's holding that this was a border search nonetheless, that will allow them to then undo that thing and they've assured the court, which is we won't go to the cloud. If this court holds that an imminent or anticipated border crossing is not necessary, then once this court so rules, they can go to the cloud when they search digital devices. So I would ask this court to consider that. Secondly, just responding to some of the questions about, for example, a bar fight... suspicion of a bar fight that's less than reasonable suspicion or probable cause. In this category of searches, we're talking about categories where the Supreme Court has upheld categories of suspicionless searches. The Supreme Court has held that purpose and pretext are important. And there I talk about the DUI stop cases. So when it is for traffic safety, Michigan versus Michigan Department of State Police, it's fine. But when it is a pretext and the primary purpose is actually general law enforcement, it's not okay. So while pretext may be allowed in the context of suspicion-based searches, they're not allowed in the context of suspicionless searches. So the rule the government is asking the court to apply would raise that problem because they would engage in pretextual searches. And then I would like to address the other question that came up of my colleague, in the event this court affirms to the district court that this is a border search, that it's a non-routine search, this court still has to be based on individualized suspicion. This court would then still have to answer what type of suspicion. I think the government counsel, I believe, misstated the record when it said the district court found probable cause. I don't believe the district court did. The district court found reasonable suspicion and believed it didn't need to reach probable cause. And I would submit that the district court correctly recognized that Riley says the highest level of privacy protection is necessary because it's a cell phone, but then the district court got it wrong in saying, but the highest level available is reasonable suspicion. There's no cases from the Supreme Court or this court saying that the warrant requirement never applies in the border context. Ramsey listed in a footnote some cases that might be too offensive to fit within the border search exception. And the examples it gave were a warrantless home search and warrantless office search. That's in note 13 in Riley. Here, we also, excuse me, in Ramsey. Here, we know from Riley that this general deep dive of a digital device is more intrusive than a home search. So I would submit that this fits within that category of cases that even the Supreme Court has suggested may be too intrusive to fit within the border search exception if the court does consider this a border search. And also to address an issue raised by the court with respect to the need to get a warrant when there's, or the need to conduct these searches when there are thousands of people crossing the border. The fact is here, the phone had been seized. We're not contesting the seizure itself. We're contesting the subsequent month-long search. It wasn't in any situation where time was particularly of the essence. There was no government interest that hindered getting a warrant. And of course, the Supreme Court has noted the increasing ease with which warrants can be gotten, thinking about the DUI blood alcohol cases, Missouri versus McNeely, where they said even decreasing blood alcohol is not in and of itself a reason to excuse getting a warrant. So in conclusion, I would ask this court to hold, first, this is not a border search at all. The interests permitting border searches weren't at play when the search began. Second, if it is a border search, I would ask the court to hold that a warrant is required. Riley was a watershed case in this area. It held that privacy interests with respect to cell phones are the highest odds that have ever been recognized. It was a unanimous case. Even Justice Alito recognized in his concurrence that it is the court's role to make a rule. Thank you. We'll come down and greet counsel and take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Pamela A. Harris